**Electronically Filed
Supreme Court
SCEC-18-0000908
09-JAN-2019
02:39 PM**

SCEC-18-0000908

IN THE SUPREME COURT OF THE STATE OF HAWAI‘I

---

MATTHEW S. LOPRESTI, Plaintiff,

vs.

STATE OF HAWAI‘I; SCOTT T. NAGO, as Chief Election Officer
for the State of Hawai‘i; and OFFICE OF ELECTIONS,
State of Hawai‘i, Defendants.

---

ORIGINAL PROCEEDING

<u>AMENDED FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT</u>
(By: Recktenwald, C.J., Nakayama, McKenna, Pollack, and Wilson, JJ.)

We have considered (1) the election complaint, filed by plaintiff Matthew S. LoPresti ("LoPresti") on November 26, 2018, (2) the statement by Sherrie J. Course ("Course"), filed by LoPresti on November 29, 2018, (3) the motion to dismiss complaint or, in the alternative, motion for summary judgment, filed by defendants State of Hawai‘i, Chief Election Officer Scott Nago ("Chief Election Officer Nago"), and the Office of Elections (collectively, "the State Defendants") on December 6, 2018, (4) the State Defendants' response to the court's December 28, 2018 order, filed on December 31, 2018, (5) LoPresti's reply to the State Defendants' response, filed on January 4, 2019,

(6) the respective supporting documents, and (7) the record in this matter. Having heard this matter without oral argument and in accordance with HRS § 11-174.5(b) (2009) (requiring the supreme court to "give judgment, stating all findings of fact and of law"), we set forth the following findings of fact and conclusions of law and enter the following judgment.

## FINDINGS OF FACT

### The November 6, 2018 General Election

1.   LoPresti was the Democratic Party candidate for the Office of State Senate, District 19 in the November 6, 2018 general election.

2.   State Senate, District 19 consists of district/ precincts 40-02, 40-03, 40-04, 41-01, 41-02, 41-03, and 41-05.

3.   Each district/precinct has its own unique ballot type containing the contests and questions that the voters in those district/precincts are eligible to vote on, based on where they live.

4.   The election results for the race for State Senate, District 19 was as follows:

```
(R) FEVELLA, Kurt                    6,205 (48.0%)
(D) LOPRESTI, Matthew S. (Matt)      6,089 (47.1%)
        Blank Votes                    623 ( 4.8%)
        Over Votes                       7 ( 0.1%)
```

5.   Kurt Fevella ("Fevella") received the highest number of votes.

6.   The difference in the votes between LoPresti and Fevella was 116 votes.

2

<u>The Election Contest</u>

7.  On November 26, 2018, LoPresti timely filed a complaint[1] challenging the election results for Office of State Senate, District 19.

8.  LoPresti alleges that irregularities in voting or in counting of votes could have caused a difference in the election outcome or could have precluded the correct result from being ascertained.  LoPresti also alleges that the 116-vote difference in the election equaled 0.9% of the total votes cast and, therefore, calls into doubt the election results.  LoPresti further alleges that irregularities at district/precinct 41-02, including potential tampering of the ballots, may have affected the election results.

9.  LoPresti contends that the electronic tabulation machines were not working from the start on election day at district/precinct 41-02 (and possibly at some of the other six polling precincts in the district), that voters were told to take the ballots away from the machine and deposit them in another box that was not locked and secured, that precinct officials had access to the box of ballots throughout the day, that a precinct official (Michele Golojuch ("Golojuch")) who was openly hostile to his candidacy was present at district/precinct 41-02, and that ballots that needed to be tabulated by machine were

_____

[1]  LoPresti's complaint was in the form of a 7-page letter addressed to this court.

3

"intentionally and deliberately physically altered and manipulated by poll workers." LoPresti maintains that these irregularities invited voter tampering and may have influenced some voters to vote against him. LoPresti also maintains that the precinct captain for district/precinct 41-02 did not closely oversee the process and "admitted to [him] that if she were in [his] shoes she would certainly ask for a recount of the votes[.]"

10. LoPresti also contends that HRS § 11-172 is unconstitutional.

11. LoPresti acknowledges that he was not present at any of the precincts on the day of the general election and that the concerns he raises in the complaint arise from conversations with the precinct captain or chair, Office of Election officials, and a voter who voted at district/precinct 41-02.

12. LoPresti seeks the following relief:

- an order requiring a hand recount and entering judgment invalidating the election results for the Office of State Senate, District 19 on the ground that a correct result cannot be ascertained because of a mistake or fraud on the part of the precinct officials;

- if the recount shows that LoPresti received the highest number of votes, then judgment be entered electing him the winner;

- an order compelling witnesses and taking the necessary steps to fully determine what occurred on the general election day at the polling precincts in the State Senate District 19 race; and

- an order requiring the State Defendants to disclose the margin of error for their voting and tabulating systems.

4

13. On November 29, 2018, LoPresti submitted a statement that purports to be from Course, who was a voter at district/precinct 41-02.

14. According to the statement, Course was the first voter to attempt to scan her ballot at district/precinct 41-02 on the day of the general election. Course states that the scanner did not work and after several attempts to scan her ballot, the precinct worker "removed a piece of equipment from the left side of the ballot box underneath the scanner" to insert the ballots through the slot. Course states that, "[h]aving seen inside the box, [she] could tell that this slot was in the correct spot to allow the ballots to drop into the receptacle below, so [she] went ahead and slipped [her] paper ballot through the slot[.]" When Course re-entered the polling place to get a slip of paper to take back to work, she noticed additional voters waiting to drop their ballots through the slot into the ballot box. Course states that she wondered whether the ballots in the bin would be properly counted. After learning that LoPresti lost the election for Senate District 19, Course contacted her friend who voted at the same precinct at approximately 8:00 a.m. or 8:30 a.m. and learned that the scanner had not been fixed. Course states that with her consent, her friend provided her telephone number to LoPresti, who contacted her to see if she would be willing to provide a statement regarding her experiences.

5

<u>The Motion to Dismiss or, in the Alternative,
Motion for Summary Judgment</u>

15. On December 6, 2018, the State Defendants moved to dismiss the complaint or, in the alternative, for summary judgment. They contend that the complaint fails to state a claim for relief because LoPresti fails to present any evidence of "errors, mistakes or irregularities," or any other such basis, such as "provable fraud, overages, or underages, that could cause a difference in the election results" as mandated by HRS § 11-172. In addition, they contend that the remedies requested by LoPresti are improper and cannot be awarded by this court in a general election contest.

16. The State Defendants argue that LoPresti's allegations of possible election fraud and voter tampering are conclusory and speculative as LoPresti does not present actual information of mistakes or errors that would have resulted in a change of 59 votes in his favor. They contend that LoPresti's suspicion of ballot tampering at district/precinct 41-02 or other precincts are insufficient to warrant relief. The State Defendants explain that there is a system in place in the event there is an equipment failure in the handling and processing of cast ballots on election day and that the procedures were followed during the period of time the eScan machine did not work properly at district/precinct 41-02 -- during that time, voters cast their ballots in the secured Emergency Ballot bin or on the

6

direct recording voting machine and when the eScan machine was replaced, the voters continued using the scanner. The State Defendants further explain that at the end of the night, the Emergency Ballot bin was opened and the ballots that were placed inside were removed and scanned; those ballots that were folded in the ballot box were flattened by the workers for scanning.

17. The State Defendants also argue that LoPresti fails to prove that HRS § 11-172 is invalid and unconstitutional beyond a reasonable doubt.

18. Attached to the motion to dismiss or, in the alternative, for summary judgment, are declarations from Chief Election Officer Nago, Joann Anoc ("Anoc"), the precinct chair for district/precinct 41-02 at Ilima Intermediate School for the 2018 elections, and Rich Geppert ("Geppert"), one of the professional services managers for Hart Intercivic, Inc. ("Hart"), the vendor of the electronic voting machines used in the 2018 elections.

19. In his declaration, Geppert states that the voting system used in the 2018 election has been used by the Office of Elections since 2008. Geppert explains that the Hart voting system is comprised of three main components to record votes -- (1) eSlate - "a direct recording electronic voting unit that provides accessible voting to individuals with disabilities" and "includes a verifiable ballot option, whereby a paper record of each vote cast is printed and retained by the device[;]" (2)

7

eScan – "a digital ballot imaging precinct counter, in which a voter inserts his or her ballot to be counted and deposited into the precinct counter[;]" and (3) Ballot Now – "utilizes high-speed scanners to scan absentee ballots to be counted."  In calculating ballots, Ballot Now uses commercial full-sheet scanning technology to record a full digital image of the voted ballot.  Typical resolution of the full-sheet scan is 200 dots per inch (dpi), which provides a high-quality digital image of the voted ballot that is saved on the Ballot Now system and is used for all subsequent election activities.  The software counts the number of pixels inside each option box in the digital image.  According to Geppert, the Ballot Now digital scanning system "has been validated in multiple studies of real election data[,]" "has been certified for use both federally and at the state level in numerous states[,]" and "has been used in hundreds, if not thousands, of elections and has accurately processed millions of votes."

20.  In his declaration, Chief Election Officer Nago explains that ballots are strictly controlled through a detailed process that involves securing the ballots at the polling place as well as when the ballots are transported from the polling place.  The ballots are secured in ballot transportation containers with uniquely numbered wire hasp seals and the use of Ballot/Seal Control Forms to track the ballots from the packing through the distribution and collection, along with the

8

requirement that ballots are handled in the presence of not less than two officials assigned in accordance with HRS §§ 11-71, 11-72, or 16-45.

21. Chief Election Officer Nago explains that the voting system that was used during the 2018 general election was "inspected and tested by official observers in preparation for use for the general election at absentee walk sites, polling places, and absentee mail voting." Chief Election Officer Nago notes that these official observers were present at the State Capitol to observe the counting of ballots.

22. Chief Election Officer Nago explains that a series of result reports are issued on election night after the polls close as supplies and equipment are transferred to the counting center. There are 4 scheduled releases of result reports targeted to be released (1) upon the close of polls, (2) at 8:30 p.m., (3) at 10:00 p.m., and (4) at 11:30 p.m. followed by an election night final report to be released once all ballots have been counted. Chief Election Officer Nago states that on the night of the general election, the manual audit team, pursuant to HAR § 3-172-102(a), audited the computer-generated results related to ballots voted at the polls in a different precinct, so as to ensure the accuracy and integrity of the voting and vote counting system; the official observers did not request an expanded audit and Chief Election Officer Nago did not see any

9

basis to question the accuracy and integrity of the voting and vote counting system.

23. Chief Election Officer Nago states that post-election audits showed no errors in the counting of votes by the voting and vote counting system. He states that the distribution of overages and underages among the district/precincts associated with State Senate, District 19 (e.g., 40-02, 40-03, 40-04, 41-01, 41-02, 41-03, and 41-05) "shows no pattern of fraud or mistake from which it could be concluded that the correct result of the election had not been ascertained." Chief Election Officer Nago states that there is no evidence that the vote counting system "has misreported or produced inaccurate results and that [LoPresti] would prevail if the ballots were counted again" and that he is "not aware of any issues or problems with the accuracy of the vote counting system, the handling of ballots, or any other matters that would impact the integrity of the general election results of State Senate, District 19."

24. Anoc was the precinct chair for district/precinct 41-02 for the 2018 general election and previously served as precinct chair for the 2018 primary election, the 2006, 2008, and 2016 primary and general elections, the 2010 general election, and the 2012 primary election. Anoc indicated that for the 2018 election cycle, she attended a precinct chair training and was provided a detailed manual.

25. According to Anoc's declaration, on the day of the general election, prior to the opening of the polls, her precinct performed the open polls procedure, but the eScan equipment was not able to scan the ballot of the first voter and, therefore, that ballot had to be deposited in the Emergency Ballot Bin.[2] Anoc called the control center and reported the problem and, after trying to resolve the problem over the phone, a troubleshooter was dispatched to the polling place.

26. Anoc stated that in the interim, while waiting for a troubleshooter, voters were informed that they could wait for the eScan to be repaired, vote on the eSlate (e.g., the direct recording electronic voting machine), or deposit their ballot in the Emergency Ballot Bin. When the Emergency Ballot Bin reached capacity, the eScan ballot box seal was cut and the ballot box unlocked with a precinct official; the Emergency Ballot Bin was then removed carefully to ensure that no ballot fell out. Anoc prepared a transport container and transferred the ballots from the Emergency Ballot Bin and packed them into the container. Anoc explained that she placed the transport container with the unscanned ballots into the bottom of the eScan ballot box to be scanned at the end of the night and returned the Emergency Ballot Bin into the ballot box, locked the ballot box door, and secured

_____

[2] The Emergency Ballot Bin is a separate bin in the ballot box and voted ballots can only be deposited through the designated slot. The slot is secured and if the eScan is inoperable, the voters may deposit their ballot in the Emergency Ballot bin.

11

the ballot box with a pull tight seal. According to Anoc, the eScan equipment was replaced at approximately 9:20 a.m.

27. Anoc stated that at the end of the day, after the last voter had voted at her precinct, close polls procedures were performed. The eScan ballot box seal was cut, the ballot box was unlocked, and the ballots were carefully removed to ensure that no ballot fell out. Precinct officials scanned the ballots from the Emergency Ballot Bin and the ballots that had been removed from the Emergency Ballot Bin and packed in the transport container when the eScan equipment was inoperable. For those ballots that were folded, the precinct officials unfolded the ballot to smooth it out before it was scanned.

28. The precinct officials then performed the close polls procedures on the eScan unit. The precinct officials removed the scanned ballots from the ballot box and packed them into voted ballot containers, which were sealed with a wire hasped seal. The seal numbers were recorded on the Ballot Seal Control Form and the voted ballot containers and various election supplies were picked up by the Delivery Collection Team to transport back to the counting center at the State Capitol.

29. Anoc explained that she was responsible for ten other precinct officials, including Golojuch, who was a voter assistance official. Anoc did not observe any inappropriate conduct by Golojuch or any other precinct official at any time.

12

Anoc explained that, after the election, she was contacted by the Office of Elections due to an inquiry by LoPresti and agreed to speak with him. Anoc stated that she explained to LoPresti everything that had occurred in the precinct on election day but never expressed that any inappropriate conduct occurred or that any precinct official altered the contents of any ballot before it was scanned. Anoc further stated that at no time did she advise LoPresti to ask for a recount; rather, she told him "it was up to him." Anoc contended that she was not aware of any issues or problems associated with district/precinct 41-02 that would have impacted the security of the ballots.

### The December 28, 2018 Order

30. On December 28, 2018, this court issued an order directing the State Defendants to provide the following information:

> 1. Information setting forth the margin of error for the electronic vote counting machines, when applying the tabulation procedures established by or in accordance to chapter 3-172 of the Hawaii Administrative Rules, that were used in the November 6, 2018 general election.
>
> 2. Information setting forth how the intent of the voter is ensured in a close election without a hand count, such as when a ballot contains marginal marks.

### The State Defendants' Response to December 28, 2018 Order

31. On December 31, 2018, the State Defendants filed a response to the court's December 28, 2018 order.

32. The State Defendants' response includes a

13

declaration from Chief Election Officer Nago and a declaration from David Magedson ("Magedson"), a program manager for Hart.

33. In his declaration, Chief Election Officer Nago states that, consistent with the Help America Vote Act of 2002, the State of Hawaiʻi's election statutes and administrative rules "provide for a uniform standard as to what constitutes a vote and what will be counted as a vote." He explains that the legislature authorized the Chief Election Officer to adopt a voting and vote counting system and to define what constitutes a proper mark for voting purposes of using the system, as has been done by administrative rules. He then describes a proper voting mark, a marginal voting mark, and an improper voting mark.

34. Chief Election Officer Nago states that on the night of the general election, the manual audit team audited the computer-generated results related to ballots voted at the polls. He explained that the audit is a hand count of the voted ballots which involved reviewing the physical ballots from the polling places associated with the selected district/precincts and confirming that the manual audit results for a selected contest on the ballot matched the computer-generated results for the selected contest. If discrepancies are found in the audit, the Chief Election Officer may authorize an expanded audit to determine the extent of misreporting within the system. For the 2018 general election, the manual audit team did not request an

14

expanded audit and Chief Election Officer Nago stated that he similarly saw no basis to question the accuracy and integrity of the voting and vote counting system.

35. Chief Election Officer Nago also states that official observers audited the computer-generated results related to absentee mail ballots. If discrepancies were found, the Chief Election Officer may authorize an expanded audit to determine the extent of misreporting within the system. For the 2018 general election, the official observers did not request an expanded audit, and Chief Election Officer Nago stated that he similarly saw no basis to question the accuracy and integrity of the voting and vote counting system.

36. Chief Election Officer Nago also explains that, going into the election, the State adopted a voting and vote counting system and, with that, a fixed objective standard as to how ballots would be counted based on a properly functioning voting and vote counting system that would be subject to inspection, audit, and testing by qualified observers before and after an election. He states that "[a]s we cannot change the rules after an election, any audit of results is focused on confirming how a properly functioning voting and vote counting system would count ballots." Thus, Chief Election Officer contends that objective evidence that the system was not operating properly would need to be presented, in order to

15

require additional auditing to occur. He states that "[u]nder no circumstances, is a different set of rules or a different standard used after an election to count ballots that were originally intended to be counted with a particular voting and vote counting system. At all times, one strives to replicate the counting by the original voting system."

37. Chief Election Officer Nago also explains his understanding of the technical nature of the voting system's handling of marginal marks and the concept of error.

38. Chief Election Officer Nago states that the machines are tested, voters are instructed in the manner in which to properly mark their ballots, and there are audits. As such, Chief Election Officer has no reason to believe there is a "margin of error" as it relates to marks made in the uniform manner established by the Office of Elections. He notes that any references to "margin of error" may be a mistaken reference to the "error rate" that is used as part of the certification of the voting system under federal standards and relates to the initial testing of the machines. In this context, "error rate" does not involve errors "attributable to an act of the voter" but instead relates to an error occurring despite all ballots being properly marked. Under Voting Systems Standards, "the system shall achieve a target error rate of no more than one in 10,000,000 ballot positions, with a maximum acceptable error rate in the

16

test process of one in 500,000 ballot positions." According to Chief Election Officer Nago, the federal standards state that "[t]his rate is set at a sufficiently stringent level such that the likelihood of voting system errors affecting the outcome of an election is exceptionally remote even in the closest of elections." He explains that based on the tests and audits of the system, he has no reason to believe that any error rate occurred with this election.

39. Chief Election Officer Nago states that the term "margin of error" may be a misnomer to describe the possible consequence of voters who make "marginal marks" that are close to the threshold that the voting system would record as a vote. He explains that "marginal marks" are not "proper marks" and are made contrary to the instructions on the ballot and, therefore, he does not consider them to constitute a "margin of error."

40. In his declaration, Magedson explains that the Hart voting system is comprised of three main components to record votes -- (1) eSlate; (2) eScan; and (3) Ballot Now. He explains how Ballot Now scans images (e.g., pixel of darkness analysis by the system), how the system operates in regard to marginal marks, the Ballot Now Overvote Reduction Algorithm to eliminate false overvotes caused by pen rests, dirt, or other small marks on the ballot, how votes are counted, and the instructions to the voters that appear on the ballot, and

17

attaches a copy of a document explaining the manner in which Ballot Now records votes.

> 9.    As indicated in the document, if more than 4.2% of the pixels are marked, the option box will be recorded as having been marked.  Additionally, when an option box is marked so that the number of counted pixels is extremely close to our threshold(+/- 7 pixels), it is possible for an option box to be read as marked in one scan, but read as unmarked in a second scan (or vice-versa).  Studies of past election data have shown that only around .046% of option boxes fall into the pixel range where variance can occur. . . .

41.  Magedeson states that, as he understands the term "margin of error," there is "no 'margin of error[]' for properly marked ballots" but notes that the election industry is a highly technical industry and uses the term "error rate" in its certification of systems.  Magedson also explains that the Ballot Now system has been validated in multiple studies of real election data and has been certified for use both federally and at the state level in numerous states in compliance with 52 U.S.C. § 21081(a)(5) (which addresses error rate standards of the voting system) and Section 3.2.1 of the 2002 Voting System Standards (entitled "Accuracy Requirements") and that the system is tested by official observers prior to the election and that there is an auditing process that, in the absence of any discovery that there was a problem, "there is no basis to believe there was an error with the machines."

18

<u>LoPresti's Reply to the State Defendants' Response</u>

42. On January 4, 2019, LoPresti filed a reply to the State Defendants' response to the December 28, 2018 order.

43. LoPresti contends that the current law, its enforcement, and/or its interpretation is unconstitutional based on the "unattainable" standard required to obtain a recount. LoPresti maintains that the ability to successfully challenge close or questionable election results is a necessary condition for voters to realize the right to a free and fair election, which must include "the opportunity for recounting ballots and/or . . . investigations into potential wrongdoing."

<u>CONCLUSIONS OF LAW</u>

1. An election contest is instituted by filing a complaint in the supreme court "set[ting] forth any cause or causes, such as but not limited to, provable fraud, overages, or underages, that could cause a difference in the election results." HRS § 11-172.

2. A complaint challenging the results of a general election pursuant to HRS § 11-172 fails to state a claim unless the plaintiff[] demonstrate[s] errors, mistakes or irregularities that could change the outcome of the election. <u>See</u> <u>Tataii v. Cronin</u>, 119 Hawaiʻi 337, 339, 198 P.3d 124, 126 (2008) (citing <u>Akaka v. Yoshina</u>, 84 Hawaiʻi 383, 387, 935 P.2d 98, 102 (1997)). <u>See also</u> <u>Funakoshi v. King</u>, 65 Haw. 312, 317, 651 P.2d 912, 915

19

(1982) ("'Difference in the election results' . . . mean[s] a difference sufficient to overturn the nomination of any particular candidate[.]").

3.  In order for a complaint to be legally sufficient, the complaint must "show[] that the specific acts and conduct . . . complained of would have had the effect of changing the results of the primary election."  Elkins v. Ariyoshi, 56 Hawaiʻi 47, 49, 527 P.2d 236, 237 (1974); Akaka, 84 Hawaiʻi at 388, 935 P.2d at 103 (in order for an election challenge to have merit, "the petitioner must 'show that he [or she] ha[s] actual information of mistakes or errors sufficient to change the result[;]'" an election contest cannot be based upon mere belief or indefinite information).  It is not sufficient that a plaintiff point to a "poorly run and inadequately supervised election process" that evinces "'room for abuse'" or "'possibilities of fraud.'" Elkins, 56 Haw. at 48, 527 P.2d at 237.

4.  "In the absence of facts showing that irregularities exceed the reported margin between the candidates, the complaint is legally insufficient because, even if its truth were assumed, the result of the election would not be affected." Tataii, 119 Hawaiʻi at 339-40, 198 P.3d at 126-27.

5.  "An election contest cannot be based upon mere belief or indefinite information."  Id.

20

6.	When reviewing a motion to dismiss a complaint for failure to state a claim upon which relief can be granted, the court must accept the plaintiff's allegations as true and view them in the light most favorable to him or her; dismissal is proper only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle him or her to relief.  AFL Hotel & Restaurant Workers Health & Welfare Trust Fund v. Bosque, 110 Hawaiʻi 318, 321, 132 P.3d 1229, 1232 (2006).

7.	Conclusory allegations and unwarranted inferences are not sufficient to defeat a motion to dismiss.  Kealoha v. Machado, 131 Hawaiʻi 62, 74, 315 P.3d 213, 225 (2013).

8.	The court's consideration of matters outside the pleadings converts a motion to dismiss into one for summary judgment.  Buscher v. Boning, 114 Hawaiʻi 202, 212, 159 P.3d 814, 824 (2007).

9.	Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Silva v. City and County of Honolulu, 115 Hawaiʻi 1, 6, 165 P.2d 247, 252 (2007).

10.	LoPresti does not provide "specific facts" or "actual information" of mistakes, errors, irregularities, error rates, or variances that could change the result of the general election or the reported differential in votes between himself

21

and Fevella. LoPresti's unsubstantiated contention that the temporary inability of the eScan equipment to scan ballots and the subsequent deposit of ballots in the Emergency Ballot Bin while the eScan equipment was replaced "possibl[y]" invited vote tampering does not demonstrate actual fraud or mistakes by precinct officials that could change the reported difference in the votes between LoPresti and Fevella. Both Nago and Anoc detailed the procedures in place when a voting machine malfunctions and the procedures that were followed at district/precinct 41-02 when the eScan machine needed to be replaced in the early hours of the commencement of the general election and in scanning those ballots that were placed in the Emergency Ballot during that time. Neither Nago nor Anoc concluded that the process that was followed negatively impacted the security of the ballots or altered the election result. LoPresti has not presented specific evidence to dispute this conclusion such that it would change the election result.

11. In addition, LoPresti's contention that a recount must be done for all "close" races does not prove that HRS § 11-172 is unconstitutional beyond a reasonable doubt.

12. LoPresti has not shown in his submissions to this court actual information of errors, mistakes, irregularities, error rates, or variances sufficient to change the outcome of the election or change the reported margin of votes between himself and Fevella.

22

Based upon the foregoing findings of fact and conclusions of law, there is no genuine issue of material fact and judgment is entered in favor of the State Defendants and against LoPresti.  Kurt Fevella received the highest number of the votes cast in the November 6, 2018 general election and has been elected to the Office of State Senate, District 19 pursuant to HRS § 11-155 (2009).[3]

A copy of this judgment shall be served on Chief Election Officer Nago who shall act in accordance with the requirements set forth in HRS § 11-174.5(b) ("If the court shall decide which candidate or candidates have been elected, a copy of the judgment shall be served on the chief election officer or county clerk, who shall sign and deliver to the candidate or candidates certificates of election, and the same shall be conclusive of the right of the candidate or candidates to the offices.").

DATED: Honolulu, Hawaiʻi, January 9, 2019.

/s/ Mark E. Recktenwald

/s/ Paula A. Nakayama

/s/ Sabrina S. McKenna

/s/ Richard W. Pollack

/s/ Michael D. Wilson

---

[3]  HRS § 11-155 provides, in relevant part, that "[t]he number of candidates to be elected receiving the highest number of votes in any election district shall be declared to be elected."